145 P.3d 899

**KAANAPALI HILLSIDE HOME- OWNERS' ASSOCIATION, a Hawai'i nonprofit corporation, by and through its BOARD OF DIRECTORS, Plaintiff– Appellee,**

v.

**Dana D. DORAN; Michael P. Doran, Defendants–Appellants**

**American Savings Bank, F.S.B. a federal savings bank, Defendant–Appellee,**

**John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1– 10; Doe Entities 1–10; Doe Governmental Agencies 1–10 and Doe Eleemosynary Corporations 1–10, Defendants.**

No. 25585.

Intermediate Court of Appeals of Hawai'i.

Oct. 13, 2006.

Dana D. Doran and Michael P. Doran, Pro Se, on the briefs, for Defendant–Appellant.

Joyce Y. Neeley, Gisela Iglesias (Neely & Anderson LLP), on the briefs, Honolulu, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

This appeal arises out of a dispute over whether Defendants–Appellants Dana D. Doran and Michael P. Doran (collectively referred to as the Dorans or Defendants) are obligated to pay homeowners' assessments to Plaintiff–Appellee Kaanapali Hillside Homeowners' Association (KHHA or Plaintiff). The Dorans owned one of 159 residential lots in the Kaanapali Hillside Subdivision (the Subdivision). KHHA owned and maintained a private park for the benefit of lot owners in the Subdivision. KHHA also provided other services benefitting lot owners, including the review and approval of architectural plans for improvements, the enforcement of architectural and land use restrictions, and the maintenance of landscaping along public rights of way. The Dorans contested the authority of KHHA to impose assessments and stopped paying their assessments. KHHA sued. After a bench trial presided over by Judge Joseph E. Cardoza, the Circuit Court of the Second Circuit (circuit court) ruled in favor of KHHA.

The Dorans appeal from the circuit court's November 26, 2002, Final Judgment in favor of KHHA, which was based on the court's post-trial "Findings of Fact and Conclusions of Law and Order" filed on September 16, 2002. The circuit court granted KHHA declaratory and injunctive relief based on the court's determination that the Dorans were obligated to pay assessments. The court also awarded monetary damages against the

Dorans for accrued assessments, late fees, and interest totaling $6,411.23, and it awarded attorney's fees and costs totaling $325,553.06.

On appeal, the Dorans raise twenty-five points of error that collectively challenge the findings and conclusions leading to: 1) the circuit court's determination that the Dorans were obligated to pay assessments to KHHA; and 2) the circuit court's award of $325,553.06 in attorney's fees and costs. For the reasons stated below, we affirm the Final Judgment except for the portion entering a monetary judgment in favor of KHHA for legal fees of $281,297.35 and costs of $44,255.71. We vacate that portion of the Final Judgment and remand the case for redetermination of attorney's fees and costs.

## BACKGROUND

### I. The Development of the Subdivision

On December 15, 1972, pursuant to an agreement of sale, Pioneer Mill Company, Limited (Pioneer) sold 70 acres of land on Maui (the Property) to Ohbayashi Hawaii Corporation (OHC). The bulk of the Property was used to develop the Subdivision.[1] On June 19, 1980, Pioneer recorded a Declaration of Covenants and Restrictions (Declaration) against the Property. Later that day, in satisfaction of the agreement of sale, a deed was recorded conveying the Property to OHC, subject to the Declaration.

On July 16, 1982, Pioneer and OHC recorded a First Amendment of Declaration of Covenants and Restrictions (First Amended Declaration), which completely amended and replaced the Declaration. The First Amended Declaration imposed various covenants and restrictions relating to land use and to permissible architecture, structures, and landscaping within the Property. The First Amended Declaration declared that the covenants and restrictions were "in furtherance of a common building scheme hereby imposed on the Property . . . for the purpose of enhancing and protecting the value, desirability and attractiveness of the Property." It

---

1. Approximately 52 of the 70 acres sold by Pioneer Mill Company, Limited (Pioneer) to Ohbayashi Hawaii Corporation (OHC) was developed into the Kaanapali Hillside Subdivision (the Subdivision).

further provided that the covenants and restrictions "shall run with the land and shall be binding on all parties having or acquiring any right, title or interest in the Property or any part thereof."

Under the First Amended Declaration, all structures built, improvements made, and landscaping done in the Property were subject to Pioneer's prior approval. Pioneer was authorized to assign its rights and duties under the First Amended Declaration "at any time" and "to any party." Pioneer, OHC, and any lot owner in the Property were authorized to bring a civil action to enforce compliance with the covenants and restrictions set forth in the First Amended Declaration. The First Amended Declaration did not include a provision establishing a procedure by which its terms could be amended.

On October 1, 1982, employees of OHC filed a Petition for Charter of Incorporation with the Department of Regulatory Agencies (now known as the Department of Commerce and Consumer Affairs), State of Hawai'i, seeking to form KHHA as a non-profit corporation. The petition was granted. KHHA's Charter of Incorporation (Charter) identified the purposes for which KHHA was organized as:

(a) To generally provide for the management, maintenance, protection, preservation, administration, and development of the property or properties located on the South-westerly side of Puukolii Road at Hanakaoo, Kaanapali, Maui, Hawaii, more particularly described in Article VII herein, and known as [the Subdivision] . . . and to promote the health, safety, and welfare of its members.

(b) To cooperate with [OHC] . . ., and any successor in interest to OHC, and with any other private or public or governmental person, agency or entity, in promoting, developing, improving and maintaining the Subdivision as a desirable residential community.

(c) To constitute and act as a permanent agency to sponsor, procure, and provide, or assist in doing any supplementary services and improvements which may be necessary, proper or appropriate in the Subdivision to make and maintain it as a desirable residential community.

(d) To assist, to the extent necessary to supplement the services, facilities and activities of or furnished by governmental agencies, in planting, irrigating, caring for, spraying, trimming, protecting and replanting trees, shrubbery, and grass within the lines of streets, walks, planting screen easements, and other areas within the Subdivision, including those deeded to the County of Maui, State of Hawaii, or any other governmental authority or agency, or otherwise dedicated to public use.

(e) To care for vacant, unimproved land or unkept lots contiguous to or within the Subdivision, to remove grass, weeds, and rubbish therefrom and do anything necessary or desirable in the opinion of the Board of Directors to keep such property neat and in good order, with the right to recover the costs of such care from the owners of the premises affected.

(f) To own, manage, maintain, repair, and/or operate a park and recreational areas, drainage and sewerline easement areas within the Subdivision, and any other common areas within or adjacent to the Subdivision, as may be designated by OHC.

The Charter provided that each owner of a lot in the Subdivision "shall automatically become a member of [KHHA] and shall be entitled to and be bound by all the rights, duties, privileges and obligations of a member" as established by the Charter, the By-Laws of KHHA, and any rules and regulations adopted by KHHA. The Charter granted various powers to KHHA, including the following express powers:

(d) It may fix, levy, collect, and enforce payment of, by any lawful means, any and all charges and assessments against its members. . . .

(e) It may adopt rules and regulations governing the facilities, properties, easements, and other areas owned and/or maintained and operated by [KHHA].

(f) It may, but shall not be obligated to, take such action as is deemed necessary to enforce any recorded or unrecorded cove-

nants and restrictions governing the use of the property within the Subdivision, including, but not limited to, the Declaration of Covenants and Restrictions ... as same may be amended from time to time.

KHHA's By–Laws provided, among other things, that

[t]he rights of membership [in KHHA] are subject to the payment of assessments levied by [KHHA], the obligation of which assessments is imposed against each Owner of and becomes a lien upon the lot against which such assessments are made....

Neither OHC nor Pioneer recorded KHHA's Charter or Bylaws against title to the lots in the Subdivision in the Bureau of Conveyances of the State of Hawai'i. The Declaration and the First Amended Declaration, which were recorded, do not mention KHHA or refer to the power of a homeowners' association to levy assessments on lot owners in the Subdivision.

The Declaration and First Amended Declaration had been recorded, KHHA had been incorporated, and its By-laws adopted before OHC sold the first residential lot in the Subdivision in April 1983. OHC conveyed lots subject to the Declaration and First Amended Declaration, but the deeds did not state that the lots conveyed were subject to KHHA's Charter or Bylaws. OHC sold the lots in three phases—Phase I, Phase II–A, and Phase II–B. Sales materials distributed by OHC to prospective buyers advised them that purchasers would automatically become members of KHHA and be required to pay assessments levied by KHHA. OHC issued a public offering statement, dated September 13, 1982, in connection with Phase I and a public offering statement, dated January 27, 1984, in connection with Phases II–A and II–B, which each contained the following statement:

By acceptance of a deed conveying title to the property, a purchaser shall automatically become a member of the Kaanapali Hillside Homeowners' Association, and shall pay any maintenance assessment or any other assessment levied against the property by the Homeowners' Association. By such an acceptance, the purchaser shall covenant, consent, and agree to abide by, comply with, and perform the covenants, conditions, restrictions contained in the Charter of the Homeowners' Association, its By–Laws, and any rules and regulations adopted by the Association.

The Association will hold, operate, and maintain certain common elements, easements in favor of the Association, and/or other areas in or adjacent to the Subdivision. It is contemplated that the Association will own, maintain, and operate a private park in the proposed Kaanapali Hillside II Subdivision. The Association will then assess each lot owner his pro rata share of the common expenses.

OHC also distributed a property report to prospective buyers, dated December 21, 1982, in connection with Phase I, which stated in relevant part:

All lot owners are required to become members of [KHHA] and pay an initial membership fee of $50.00. The dues will be about $34.00 per lot per month. The dues can be increased through the action of the Board of Directors of [KHHA]....

Members may be subject to special assessments if they are imposed by [KHHA], through its Board of Directors.

....

The current level of assessments, fees, charges, or other income is expected to provide the capability for [KHHA] to meet its present or planned financial obligation, including operating costs, maintenance and repair costs, and reserves for replacement. However, if the assessments are insufficient to meet the Association's expenses, the membership's assessments may be increased to cover the deficit.

A similar notification was contained in the property report, dated May 23, 1984, distributed to buyers in connection with Phase II–A and II–B, except that the May 23, 1984, report stated that the dues "are" $34.00 per lot per month and that members "will be" subject to special assessments if imposed by KHHA.[2] The May 23, 1984, property report

---

**2.** The first page of both the December 21, 1982, property report and the May 23, 1984, property

also advised prospective buyers of OHC's ongoing construction of a 57,697 square foot park/playground. The May 23, 1984, property report stated that OHC planned to convey the park to KHHA, that KHHA would then be responsible for operating and maintaining the park, and that KHHA "may set cost and use [r]egulations" with respect to the park. The availability of the park in the Subdivision was an important component of OHC's sale of lots to owners.

On March 27, 1986, a deed was recorded conveying the land comprising the park from OHC to KHHA. Since that time, KHHA has maintained the park as a private park available for use by KHHA members only. The park contains improvements such as walkways, lights, benches, picnic tables, grass, trees, and hedges which require regular expenditures for repair, maintenance, and replacement. The park has been a benefit to lot owners in the Subdivision. It has been used by lot owners for recreational activities and has provided open space for the Subdivision.

On June 20, 1988, a Partial Assignment of Declaration of Covenants and Restrictions (Partial Assignment) was recorded in the Bureau of Conveyances. Pursuant to the Partial Assignment, Pioneer assigned and transferred to KHHA all of Pioneer's rights, duties, and obligations under the Declaration and First Amended Declaration as they pertained to the Subdivision property. KHHA agreed to enforce each of the provisions, covenants, and conditions of the Declaration and First Amended Declaration and to indemnify Pioneer against any loss or damage arising from KHHA's failure to do so. OHC consented to and joined in the Partial Assignment.

By virtue of the Partial Assignment, KHHA has been responsible since 1988 for reviewing and approving architectural plans for improvements to lots submitted by lot owners. KHHA has monitored construction of the improvements to ensure compliance with the approved plans and specifications. KHHA has also enforced the other covenants and restrictions contained in the First Amended Declaration. It has incurred expenses in resolving disputes relating to its architectural review decisions and its enforcement of covenants and restrictions, including pursuing and defending against lawsuits arising out of these matters.

In addition to maintaining the park, reviewing and approving plans for proposed improvements, and enforcing the covenants and restrictions in the First Amended Declaration, KHHA has provided other services that benefit the Subdivision. Among other things, KHHA has maintained a planting screen easement and landscaping along public rights of way, including an irrigation system and fences within the landscaped area. It has cleaned unkempt vacant lots by mowing them and removing rubbish. KHHA also maintained the roads in the Subdivision until the roads were dedicated to the County of Maui in April 1990. KHHA has imposed assessments against lot owners and collected such assessments to fund its activities since October 1, 1983.

## II. The Dorans' Purchase of Their Lot

On July 5, 1996, the Dorans became the owners of Lot No. 42 in the Subdivision when their warranty deed was recorded. Prior to purchasing their lot, the Dorans had actual and constructive notice of the existence of KHHA. The Dorans' warranty deed stated that their lot was subject to the Declaration, the First Amended Declaration, and the Partial Assignment. The Partial Assignment identified KHHA as the organization responsible for enforcing the covenants and restrictions in the Declaration and First Amended Declaration. The Dorans' warranty deed, however, did not state that their lot was subject to KHHA's Charter or By-laws.

Prior to closing, the Dorans received documents which referred to KHHA, the mandatory nature of membership in KHHA, and the obligation to pay assessments for services provided by KHHA. In particular, the Dorans admit they received copies of KHHA's Charter and By-laws before they purchased. The Dorans' Deposit Receipt Of-

report state that "[f]ederal law requires that you receive this Report prior to your signing a con-

tract or agreement to buy or lease a lot in this subdivision."

fer and Acceptance (DROA) stated that "Maintenance Fees are $240.00 paid quarterly," and their escrow settlement statement reflected the apportionment of the $240.00 quarterly maintenance fee with the seller. The Dorans' DROA notified them that their obligation to purchase was contingent on their review of homeowner organization documents, including the articles of incorporation, by-laws, minutes of the last annual meeting, and financial statements. The Dorans also executed a mortgage dated July 1, 1996, that contained a planned unit development (PUD) rider, which stated that the Dorans' property was part of a PUD. The PUD rider required the Dorans to perform all their obligations under PUD's "Constituent Documents," which were defined to include the owners association's articles of incorporation and by-laws. The Dorans were required to "promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents."

At trial, Michael Doran testified that at the time he purchased his home, he was under the impression that the Subdivision was a PUD, that membership in KHHA was mandatory, and that he was obligated to pay assessments to KHHA. From July 1996 through March 1999, the Dorans paid assessments to KHHA, participated in KHHA meetings, and even requested that KHHA enforce the land use restrictions contained in the First Amended Declaration against other lot owners. In February 1999, however, the Dorans circulated a newsletter to homeowners disputing the authority of KHHA to collect assessments. The Dorans stopped paying their assessments and demanded that KHHA refund the assessments they had previously paid. On June 22, 1999, the Dorans sued KHHA in small claims court seeking the return of assessments paid to KHHA. The suit was later dismissed.

### III. The Circuit Court Proceedings

On August 2, 1999, KHHA filed a complaint in circuit court against the Dorans, American Savings Bank, F.S.B. (American Savings), and various Doe individuals and entities. KHHA sought: 1) a judgment declaring that the Dorans were obligated to pay assessments (Count 1); 2) an injunction ordering the Dorans to pay assessments (Count 2); 3) a lien against the Dorans' lot for the assessments and other charges due and owing (Count 3); 4) a judgment against the Dorans for the assessments and other charges due and owing (Count 4); 5) a judgment estopping the Dorans from refusing to pay assessments and other charges due (Count 5); 6) a foreclosure sale of the Dorans' lot as a means of collecting the outstanding fees and charges (Count 6); and 7) an award of attorney's fees and costs (Count 7). KHHA's claims against American Savings were later voluntarily dismissed by stipulation.

On May 4, 2000, Judge Artemio Baxa entered an order granting the Dorans' motion for partial summary judgment and dismissing Count 6 of the complaint (the foreclosure count) with prejudice. In the order, Judge Baxa found:

1. That Plaintiff is not an "association" within the meaning of Hawai'i Revised Statutes [HRS] Chapter 421J [2004].

2. The mandatory membership in Plaintiff and any obligation to pay assessments is not a real covenant running with the land at law.

3. That there is not and has never been any present, valid, existing lien on Defendant's property in favor of Plaintiff.

After a bench trial before Judge Cardoza held in August and September of 2002, Judge Cardoza ruled in favor of KHHA on all the remaining counts. Judge Cardoza entered a Final Judgment in favor of KHHA that: 1) declared that the Dorans are required to pay their share of the costs of maintaining the common area and administering the Subdivision; 2) granted injunctive relief ordering the Dorans to comply with their payment obligations as long as they own Lot 42; 3) determined that KHHA has a lien on the Dorans' lot for unpaid assessments and other charges due and owing and a right to enforce the lien; 4) entered a monetary judgment in the sum of $6,411.23, representing accrued assessments of $5,150, late fees of $775, and interest of $486.23; 5) entered judgment equitably or otherwise estopping the Dorans from refusing to pay assessments and other

charges due to KHHA; and 6) entered a monetary judgment in favor of KHHA for its legal fees of $281,297.35 and its costs of $44,255.71.

In the Final Judgment, Judge Cardoza acknowledged the prior dismissal of KHHA's foreclosure count by Judge Baxa but ruled that KHHA is not precluded from attempting to enforce its lien for unpaid assessments and other charges under any available remedies, including foreclosure. In his post-trial "Findings of Fact and Conclusions of Law and Order," Judge Cardoza also reconsidered and reversed the earlier findings made by Judge Baxa when Judge Baxa granted the Dorans' motion for partial summary judgment and dismissed the foreclosure count. Judge Cardoza concluded that: 1) KHHA is an association within the meaning of HRS Chapter 421J (2004); 2) that mandatory membership in KHHA and the obligation to pay assessments are covenants running with the land; and 3) KHHA has a valid lien on the Dorans' lot to secure payment of assessments. Judge Cardoza's determination that KHHA was an association under HRS Chapter 421J was particularly significant because it provided a statutory basis for KHHA to seek full recovery of its attorney's fees and costs.

### DISCUSSION

I. The Dorans Are Obligated to Pay Assessments.

■ The Dorans' core argument is that they are not obligated to pay assessments to KHHA because the Declaration and First Amended Declaration do not mention KHHA and do not impose an obligation upon lot owners to pay assessments. The Dorans do not dispute that KHHA's Charter and By-laws provide that KHHA is authorized to levy and collect assessments against lot owners. They argue, however, that because KHHA's Charter and By-laws were not recorded by OHC or Pioneer against lots in the Subdivision (including their lot), they are not bound by any obligation to pay assessments set forth in the Charter and By-laws. We disagree with the Dorans and hold that they are obligated to pay assessments to KHHA. Even though the Declaration and First Amended Declaration did not refer to KHHA or impose an express obligation to pay assessments, we conclude that the Dorans were bound by an implied obligation to pay assessments to KHHA under the circumstances of this case.

In *Paradise Hui Hanalike v. Hawaiian Paradise Park Corp.*, 66 Haw. 362, 662 P.2d 211 (1983), the Hawai'i Supreme Court addressed the question of whether the obligation to pay for road maintenance could be imposed on lot owners in a subdivision where their deeds did not mention such an obligation. The court held that "the lot owners whose lots abut on subdivision roads have a legal duty to contribute to necessary maintenance of the roads in the subdivision even though their deeds are silent on the matter." *Id.* at 363–64, 662 P.2d at 212.

Courts in other jurisdictions have similarly recognized an implied obligation of a homeowner in a residential development to pay assessments to a homeowners' association whose services benefit the development. *E.g.*, *Seaview Ass'n of Fire Island, N.Y., Inc. v. Williams*, 69 N.Y.2d 987, 517 N.Y.S.2d 709, 510 N.E.2d 793 (1987); *Meadow Run & Mountain Lake Park Ass'n v. Berkel*, 409 Pa.Super. 637, 598 A.2d 1024 (1991); *Perry v. Bridgetown Cmty. Ass'n, Inc.*, 486 So.2d 1230 (Miss.1986); *Sea Gate Ass'n v. Fleischer*, 211 N.Y.S.2d 767 (N.Y.Sup.Ct.1960).

In *Seaview Ass'n of Fire Island, N.Y.*, 517 N.Y.S.2d 709, 510 N.E.2d at 794, the court held:

Where there is knowledge that a private community homeowners' association provides facilities and services for the benefit of community residents, the purchase of property there may manifest acceptance of conditions of ownership, among them payment for the facilities and services offered. The resulting implied-in-fact contract includes the obligation to pay a proportionate share of the full cost of maintaining those facilities and services, not merely the reasonable value of those actually used by any particular resident.

In *Meadow Run & Mountain Lake Park Ass'n*, 598 A.2d at 1026, the court concluded:

Residential communities such as Meadow Run and Mountain Lake Park, are "analogous to mini-governments" and as such are dependent on the collection of assessments to maintain and provide essential and recreational facilities. When ownership of property within a residential community allows the owners to utilize roads and other common areas of the development, there is an implied agreement to accept the proportionate costs for maintaining and repairing these facilities.

> The right of the Association to exercise the control of the easements and to maintain them in condition so that they can be mutually used and enjoyed by all property owners has long been settled by the courts. Inherent in its right of management is the right to maintain. Maintenance costs money. Those who are entitled to enjoy the easements are the ones who must pay the costs of maintenance . . .

(citations omitted) (quoting *Sea Gate Ass'n*, 211 N.Y.S.2d at 778–779, in internal block quote).

In *Spinnler Point Colony Ass'n, Inc. v. Nash*, 689 A.2d 1026 (Pa.Commw.Ct.1997), the appellants were owners of a lot in a private residential development. The court held that the appellants were required to pay a proportionate share of the costs incurred by a homeowners' association in maintaining the development's roads, facilities, and amenities, even though there was no mention of the association in the appellants' chain of title. *Id.* at 1028–29. The court reasoned:

> Appellants are the beneficial users of the common areas of the development, and as such, they are responsible for the cost of repair, maintenance and upkeep of the common areas. If we were to find to the contrary, lot owners would be able to avoid their duty to pay assessments, and because associations would be powerless to operate, the facilities of a development would fall into disrepair.

*Id.* at 1029.

KHHA was incorporated for the purposes of managing and maintaining the Subdivision for the benefit of lot owners in the Subdivision. It is clear that OHC, the Subdivision's developer, intended that KHHA would function to manage the Subdivision and provide beneficial services and that KHHA would have the power to impose assessments against lot owners to pay for its operating expenses. KHHA has maintained a private park and landscaping along public rights of way, been responsible for reviewing and approving lot owners' plans for improvements to preserve the architectural integrity of the Subdivision, enforced land use and other restrictions, and provided other services benefitting lot owners in the Subdivision. The circuit court found that without the ability to impose and collect assessments, KHHA would not be able to sustain its operations:

> Absent mandatory assessments, KHHA would not be able to sustain operations and maintain the park or landscaping that is part of the Subdivision. It would be unable to procure insurance. The members of the Board of Directors would not continue to serve without the protection of directors and officers liability insurance coverage.

Prior to purchasing their lot, the Dorans were aware of KHHA's existence and that KHHA was collecting assessments from lot owners to support the services it provided. The Dorans' lot was conveyed subject to the Partial Assignment, which gave KHHA the authority to exercise architectural control over improvements in the Subdivision and to enforce the covenants and restrictions in the First Amended Declaration. Before purchasing their lot, the Dorans received KHHA's Charter and By-laws, which provided that KHHA had the power to levy and collect assessments from lot owners. We hold that under the circumstances of this case, the Dorans implicitly contracted and agreed to pay the assessments authorized under KHHA's Charter and By-laws. The Dorans were bound by an implied obligation to pay their share of the costs incurred by KHHA in providing services that benefitted the Subdivision.

**II. KHHA Was Not Entitled to Attorney's Fees and Costs under HRS § 421J–10.**

**A.**

■ Under the "American Rule," which we follow, each party is responsible for pay-

ing his or her own attorney's fees unless the award of attorney's fees is authorized by statute, rule of court, agreement, stipulation, or precedent. *808 Dev., LLC v. Murakami*, 111 Hawai'i 349, 141 P.3d 996, 1010 (2006). In describing arguments raised in support of the American Rule, the United States Supreme Court stated that

> since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel.

*Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

We note that under HRS § 607–14 (Supp. 2005), attorney's fees in actions in the nature of assumpsit are generally limited to twenty-five percent of the judgment. In this case, KHHA's monetary judgment for accrued assessments, late fees, and interest was $6,411.23. The circuit court, however, awarded KHHA attorney's fees of $281,297.35.

HRS Chapter 421J (2004) applies to planned community[3] associations and contains an attorney's fees provision that does not limit the recovery of attorney's fees based on the amount of the judgment. HRS § 421J–10 (2004) provides that a party that qualifies as an "association" under HRS Chapter 421J is entitled to recover

> [a]ll costs and expenses, including reasonable attorneys' fees, incurred by or on behalf of the association for:
>
> (1) Collecting any delinquent assessments against any unit or the owner of any unit;
>
> (2) Foreclosing any lien on any unit; or
>
> (3) Enforcing any provision of the association documents or this chapter....

Although the circuit court did not specify the statutory basis for its award of attorney's fees and costs, it is clear that the court's award was pursuant to HRS § 421J–10. The parties on appeal agree that the circuit court awarded attorney's fees and costs pursuant to § 421J–10. KHHA moved in the circuit court for attorney's fees pursuant to HRS § 421J–10 and HRS § 607–14.5 (Supp.2005).[4] HRS § 607–14.5 authorizes a court to award attorney's fees against a party if the court finds "in writing" that all or a portion of the party's claim or defense was frivolous. The circuit court's award of attorney's fees was not accompanied by a written finding that the Dorans' defenses were frivolous. KHHA moved for costs pursuant to HRS § 421J–10 and HRS § 607–9 (1993). The circuit court's award of $44,225.71 in costs included items,

---

**3.** The term "planned community" is defined in Hawaii Revised Statutes (HRS) § 421J–2 (2004) as follows:

> "Planned community" means a common interest community, other than a condominium or a cooperative housing corporation or a time share plan, which includes all of the following characteristics:
>
> (1) Real property subject to a recorded declaration placing restrictions and obligations on the owners of the real property and providing for rights and responsibilities of a separate entity, the association:
>
> (A) Which owns and maintains certain property within the planned community for the common use or benefit, or both, of the owners of units within the planned community;
>
> (B) Which is obligated to maintain certain property it does not own within the planned community for the common use or benefit, or both, of the owners of units within the planned community; or
>
> (C) Which is obligated to provide services to any such owners or units;
>
> (2) Individual owners own separate units which are part of a planned community at least some of which are improved by or are to be improved by residential dwellings;
>
> (3) Owners have automatic and non-severable membership in an association by virtue of ownership of units within the planned community; and
>
> (4) Owners, other than a master developer or declarant, are obligated to pay mandatory assessments by virtue of ownership of a unit within the planned community.

**4.** In its motion for attorney's fees in the court below, Plaintiff–Appellee Kaanapali Hillside Homeowners' Association (KHHA or Plaintiff) also included a $2,995.06 sanction previously imposed by Judge Shakley F. Raffetto. The sanction was for the violation of Hawai'i Rules of Civil Procedure (HRCP) Rule 11 by Defendants–Appellants Dana D. Doran and Michael P. Doran (collectively referred to as the Dorans or Defendants) in connection with the Dorans' motion to dismiss the complaint.

such as expert fees, that KHHA only argued were authorized under HRS § 421J–10.

### B.

■ The Dorans argue that KHHA did not meet the HRS Chapter 421J definition of "association" and thus the circuit court erred in awarding attorney's fees and costs pursuant to HRS § 421J–10. We agree.

The term "association" is defined in HRS § 421J–2 (2004) as follows:

> "Association" means a nonprofit, incorporated, or unincorporated organization upon which responsibilities are imposed and to which authority is granted *in a declaration* which governs a planned community.

(Emphasis added.) The term "declaration" in turn is defined as follows:

> "Declaration" means any *recorded instrument,* however denominated, that imposes on an association maintenance or operational responsibilities for the common area and *creates the authority in the association to impose on units, or on the owners or occupants of the units, any mandatory payment of money as a regular annual assessment or otherwise in connection with the provisions, maintenance, or services for the benefit of some or all of the units, the owners, or occupants of the units or the common areas.* A declaration includes any amendment or supplement to

the instruments described in this definition.

HRS § 421J–2 (Emphases added). The Dorans argue that KHHA did not qualify as an association because it was not granted authority in a declaration satisfying the statutory definition. They contend that there were no recorded instruments that created the authority in the association to impose on units—in this case the Subdivision lots—or on the owners or occupants of the lots, any mandatory payment of money.

KHHA counters that it qualified as an association based on the Partial Assignment, which assigned Pioneer's rights, duties, and obligations under the First Amended Declaration to KHHA. In particular, KHHA notes that the First Amended Declaration, as assigned, required a lot owner [5] seeking architectural approval for planned improvements from KHHA to bear all costs incurred in connection with the review and approval process.[6] The First Amended Declaration further authorized KHHA to bring a civil action to enforce land use and architectural restrictions against a lot owner who violated such restrictions and to recover damages and attorney's fees in such an action.[7] KHHA argues that in these two ways, the First Amended Declaration, in conjunction with the Partial Assignment, created the authority in KHHA to impose on lot owners a "manda-

---

5. For purposes of our discussion on the applicability of HRS Chapter 421J (2004), our use of the term "lot owner" refers to the owner or occupant of the lot and our use of the term "lot owners" refers to the owners or occupants of the lots.

6. Paragraph 2 of the First Amendment of Declaration of Covenants and Restrictions (First Amended Declaration) provided in relevant part:

> 2. *Architectural control.* No structure shall be erected, placed or altered on the Property until the plans and specifications therefor have been submitted to and approved by [KHHA]. The term "structure" shall include all buildings, fences, walls and other improvements of every description. . . . The owner or other party seeking architectural approval from [KHHA] will bear all costs, including reasonable architects, engineers, attorneys and overhead charges, incurred in connection with reviewing and approving plans and specifications.

(Substituting "KHHA" for "Pioneer" in brackets.)

7. Paragraph 15 of the First Amended Declaration provided in relevant part:

> 15. *Enforcement.* In the event any owner of the Property or any part thereof or interest therein (for purposes of this paragraph 15, every dwelling unit occupant shall be deemed to own an interest in the Property) violates any provision hereof, [KHHA], Ohbayashi, or the owner of the Property or part thereof or interest therein may bring an appropriate civil action against the defaulting party to enforce specific compliance with this Declaration and the provisions herein contained, or to recover damages for such violation, plus a reasonable attorney's fee, as may be incurred by said prosecuting party in such proceeding or action. . . .

(Substituting "KHHA" for "Pioneer" in brackets.) As used in the First Amended Declaration, the reference to "this Declaration" means the First Amended Declaration.

tory payment of money ... in connection with ... services for the benefit of some or all of the [lots]." We are not persuaded by KHHA's arguments.

### C.

We agree with the Dorans that KHHA's ability to require a lot owner to pay the costs associated with architectural approval for desired improvements to his or her own lot does not demonstrate that KHHA had the authority to impose on *lot owners* a "mandatory payment of money as a regular annual assessment or otherwise" under the HRS § 421J–2 definition of "declaration." Nor is the statutory definition satisfied by KHHA's ability to collect damages or attorney's fees in a civil suit to enforce land use and architectural restrictions. Under the First Amended Declaration, as assigned, KHHA did not have the authority to impose a "mandatory payment" on lot owners because KHHA could not compel lot owners to pay any money.[8] Only the particular lot owner who sought architectural approval for desired improvements or who violated a restrictive covenant was obligated to pay.

As we construe the HRS § 421J–2 definition of "declaration," the recorded instruments must give the association the power to require lot owners, on a collective basis, to pay for the services rendered by the association. The ability to demand payment from an individual lot owner for a specific service requested by that lot owner or as a sanction for that lot owner's violation of the restrictive covenants is not enough. Otherwise, the statute's use of the plural form of the term "units" in referring to "the authority in the association to impose on units" and the statute's use of the term "mandatory" to describe the "payment of money" would be superfluous. *See Camara v. Agsalud*, 67

Haw. 212, 215–16, 685 P.2d 794, 797 (1984) ("It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute."). Although KHHA's *unrecorded* Charter and By-laws provided that KHHA had the authority to impose mandatory payments of money on lot owners, the instruments that had been *recorded* against the Subdivision lots did not.[9]

We acknowledge that the Legislature's purpose in enacting HRS Chapter 421J was to provide a framework for self-governance by planned community associations. The committee reports accompanying the legislation stated:

> Currently, there is no law that sets forth the basic framework for self-governance by planned community associations. Each planned community association is governed by their respective association documents. Thus, there is no consistency among planned community associations and some have no basic self-governance provisions. This bill will provide the basic framework and owner rights for self-governance.

Hse. Stand. Comm. Rep. No. 980, in 1997 House Journal, at 1480–81 and Sen. Stand. Comm. Rep. No. 1188, in 1997 Senate Journal, at 1345. KHHA argues that given the purpose of HRS Chapter 421J, we should construe the HRS Chapter 421J definition of "association" and "declaration" expansively to increase the statute's reach. We are still bound, however, to give the statute a reasonable interpretation. Under the statute's plain language, HRS Chapter 421J only ap-

8. Under KHHA's reasoning, because a service provider can charge for services rendered and a vendor can charge for goods sold, they have the authority to impose a mandatory payment. In our view, the service provider or vendor in these situations would not commonly be understood or described as having the authority to impose a mandatory payment.

9. We note that HRS § 607–14 (Supp.2005) excludes a planned community association in-

volved in actions described in HRS § 421J–10 (2004) from the twenty-five-percent-of-the-judgment limitation on attorney's fees that is normally imposed in assumpsit actions. For purposes of this exclusion, HRS § 607–14 defines a "planned community association" as a "nonprofit homeowners or community association existing pursuant to covenants running with the land."

plies to associations whose authority to impose mandatory payments of money on units, or on the owners or occupants of the units, are set forth in *recorded instruments*. In our view, interpreting HRS Chapter 421J to include KHHA within the definition of "association" based on the First Amended Declaration, as assigned, would stretch the reading of the statutory language too far—beyond reasonable limits.

We conclude that KHHA did not qualify as an association under HRS Chapter 421J. Accordingly, we hold that KHHA was not entitled to attorney's fees and costs pursuant to HRS § 421J-10. Because the circuit court awarded attorney's fees and costs to KHHA based on HRS § 421J-10, we remand the case for redetermination of the appropriate amount of attorney's fees and costs to award. We express no opinion on whether and to what extent attorney's fees and costs may be awarded on grounds other than HRS § 421J-10.[10]

## CONCLUSION

We affirm the November 26, 2002, Final Judgment of the Circuit Court of the Second Circuit, except that we vacate the portion of the Final Judgment that entered a monetary judgment in favor of KHHA for legal fees of $281,297.35 and costs of $44,255.71.[11] We remand the case for redetermination of the appropriate amount of attorney's fees and costs to award.

10. The record shows that after the trial in this case, KHHA recorded an "Amended and Restated Declaration of Covenants and Restrictions of Kaanapali Hillside Homeowners's Association" (Amended and Restated Declaration), which "amended and restated" the previously recorded Declaration of Covenants and Restrictions (Declaration) and First Amended Declaration. The Amended and Restated Declaration includes provisions that specifically authorize KHHA to impose assessments on the owners of lots in the Subdivision. The Amended and Restated Declaration cites HRS § 421J-12 (2004), which establishes procedures under which a planned community association can amend a "declaration" under HRS Chapter 421J.

We do not reach the question of whether the Amended and Restated Declaration is valid. The validity of the Amended and Restated Declaration is a question that is collateral to our decision and is unnecessary for us to decide. Our conclusion that KHHA did not qualify as an "association" under HRS Chapter 421J, however, casts significant doubt on whether KHHA could amend the Declaration and First Amended Declaration pursuant to HRS § 421J-12.

11. With respect to the portions of the Final Judgment that we affirm, we do not necessarily agree with all the findings of fact and conclusions of law relied upon by Circuit Court of the Second Circuit (circuit court). However, for the reasons stated in this opinion, we do agree that the circuit court correctly decided the portions of the Final Judgment we affirm.