[No. 8744–1–III.   Division Three.   June 21, 1988.]

PEOPLE FOR THE PRESERVATION AND DEVELOPMENT OF FIVE
MILE PRAIRIE, ET AL, *Appellants,* v. THE CITY
OF SPOKANE, *Respondent.*

*William Powell* and *Powell & Morris,* for appellants.

*James C. Sloane, City Attorney,* and *Gregory Smith, Assistant,* for respondent.

McINTURFF, C.J.—People for the Preservation of Five Mile Prairie and several individuals (hereafter referred to as Landowners) appeal a judgment dismissing their writ of certiorari to review the enactment of an ordinance annexing part of Five Mile Prairie. They contend, *inter alia,* the Spokane City Council lacked jurisdiction to entertain the petition for annexation because the petition did not contain the number of signatures required by statute.

On August 20, 1984, the City Council adopted an ordinance which annexed 199 acres of land on Five Mile Prairie. The Landowners applied to the superior court for a writ of certiorari to review the City Council proceedings. On October 18, 1985, the Superior Court by memorandum opinion stated it would dismiss the writ of certiorari with prejudice. The Landowners moved for reconsideration, but the Superior Court entered orders denying that motion and dismissing the writ of certiorari.

The Landowners' assignments of error attack the procedure used by the City Council in approving annexation. Generally, they present two issues. The first issue focuses

on the requirement of RCW 35.13.130[1] that when annexation proceedings are initiated by petition of the area's landowners, as here, the petition must contain the signatures of the owners of 75 percent of the assessed valuation of property in the area.

The Landowners contest the use of the names of Gene and Bernadette Reed and Curt and Gloria Kruger on the petition. Those names were included on the basis of a covenant contained in a water service agreement by which the Reeds' predecessors and the Krugers promised to sign any petition for annexation and actively promote the same in consideration of the City furnishing water to their properties.[2] The Reeds and the Krugers had requested unsuccessfully that their names be deleted from the petition. Without their names, the petition does not meet the statute's 75 percent requirement.

The second issue concerns compliance with the requirement of RCW 35.13.125[3] that those seeking annexation file

---

[1] RCW 35.13.130 provides, in part: "[T]he petition [for annexation] must be signed by the owners of not less than seventy-five percent in value according to the assessed valuation . . . of the property for which annexation is petitioned: . . ."

[2] The covenant read:

"In the event the City of Spokane, in its discretion, furnishes water to the above-described land, then in consideration and as a condition of such furnishing of water, the undersigned and each of them, for himself and for his successors in interest, covenant to the City of Spokane, and to the present and future owners of any property affected by the furnishing of City water to which this covenant relates, that they shall, whenever so requested, sign any letter, notice, petition or other instrument initiating, furthering or accomplishing the annexation of the above-described land to the City of Spokane, and shall actively promote such annexation, whether or not the annexation involves the assumption by the area to be annexed of existing City of Spokane indebtedness, the application to the area to be annexed of the Comprehensive Plan and land use controls of the City of Spokane, and such other conditions as the City may lawfully impose."

[3] RCW 35.13.125 provides, in part: "Prior to the circulation of a petition for annexation, the initiating party or parties . . . shall *notify* the legislative body of the city or town in writing *of their intention* to commence annexation proceedings. The legislative body shall set a date . . . for a meeting with the initiating parties to determine whether the city or town will accept the proposed annexation, whether it shall require the simultaneous adoption of the comprehensive

a notice of intent with the City Council, and the requirement of RCW 36.93.090[4] that the City file a notice of its intention to annex with the Boundary Review Board. A notice was filed with the City Council in 1979, at which time the City Council indicated its willingness to accept annexation subject to conditions recommended by the City Plan Commission. The Boundary Review Board also approved annexation at that time. However, this petition for annexation was not presented until July 1984, and contained a section denominated "Phase II" in which 60 of the original 251 acres proposed for annexation were withheld for later action.

First, did the annexation petition with the attached covenants comply with the signature requirement of RCW 35.13.130? For the following reasons, the Landowners contend it did not: (1) annexation must be in the manner prescribed by statute, and RCW 35.13.130 states that the petition must be signed; (2) the covenants violated the Landowners' First Amendment rights; (3) they attached an unreasonable and arbitrary condition to the provision of water service; (4) the petition was not pending at the time the Landowners entered into the water service contracts, thus, the covenants were an invalid attempt to waive a *future* right to oppose annexation; (5) the covenants did not run with the land and, therefore, did not bind the Reeds, who were subsequent purchasers; and (6) the water service contracts were themselves illegal because they were obtained in contravention of the Boundary Review Board, which had denied an earlier City proposal to install additional water mains in Strong Road and Five Mile Road.

---

plan . . ., and whether it shall require the assumption of all or of any portion of existing city or town indebtedness by the area to be annexed." (Italics ours.)

[4]RCW 36.93.090 provides, in part:

"Whenever any of the following described actions are proposed . . ., the initiators of the action shall file within one hundred eighty days a notice of intention with the board: . . .

"(1) The: (a) . . . change in the boundary . . . of any city . . ."

1. Was the petition in the form prescribed by RCW 35.13.130?

Our Washington Supreme Court has applied the doctrine of "substantial compliance" to statutory requirements that are jurisdictional in nature as well as to those that are procedural. *In re Saltis*, 94 Wn.2d 889, 896, 621 P.2d 716 (1980). The determining consideration is whether the purpose of the statutory requirement has been fulfilled; if it has, then strict compliance is unnecessary. *Fisher Bros. Corp. v. Des Moines Sewer Dist.*, 97 Wn.2d 227, 230–31, 643 P.2d 436 (1982).

The purpose of the signature requirement of RCW 35.13.130 is to insure that a significant number of the persons most affected by a decision to annex support that decision. Here, the Reeds' predecessors and the Krugers made a legal and binding promise to support annexation. Neither the City Council nor the courts can be parties to a breach of that contract by allowing them to withdraw that support now. We hold that the signed covenant was the substantial equivalent of the Reeds' and Krugers' signatures on the petition and, thus, the petition complied with RCW 35.13.130.

2. Do the covenants violate First Amendment rights?

The guaranties of freedom of speech were designed to prohibit "any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential. . . .'" *Bigelow v. Virginia*, 421 U.S. 809, 829, 44 L. Ed. 2d 600, 95 S. Ct. 2222 (1975) (quoting 2 Cooley, *Constitutional Limitations* 886 (8th ed.)). Here, the Reeds' predecessors and the Krugers obtained city water service in exchange for their promise to support annexation. The City did not violate the covenantors' First Amendment rights because (1) the covenant is unambiguous; (2) there is no showing that it was the product of coercion; and (3) in any event, the Landowners were allowed to voice their opposition to annexation at the City Council meetings. The City's action in obtaining the

covenants did not prevent "free and general discussion" of the question of annexation. Rather, the covenantors voluntarily agreed to forego their right to such discussion, and, even when they broke that promise by speaking against annexation, the City did not complain.

3. Are the covenants arbitrary, capricious, or contrary to public policy?

A city may contract with persons outside its limits for furnishing them with water, "which contract may fix the terms upon which the outside distribution systems will be installed . . ." RCW 35.92.200. Although authorized to extend its water service outside its boundaries, a city is not compelled to do so. In *Brookens v. Yakima,* 15 Wn. App. 464, 465, 550 P.2d 30, *review denied,* 87 Wn.2d 1011 (1976), we held that a city which had extended water service outside its corporate limits by contract properly could refuse to increase the water supply based on the landowner's failure to comply with city land use regulations. *Brookens,* at 466, relied on the contractual nature of the parties' relationship and on the fact the original contract did not provide for the supply of water to the *entire* tract owned by the water user.

Nevertheless, the Landowners cite authority that municipalities in the exercise of *discretionary* powers must act reasonably. 5 E. McQuillin, *Municipal Corporations* § 1804, at 316 (3d ed. 1981); *Reid Dev. Corp. v. Parsippany–Troy Hills,* 10 N.J. 229, 89 A.2d 667, 669–70 (1952) (local governing body cannot refuse water service to persons within its area of responsibility on arbitrary grounds). These authorities are distinguishable from the situation here:

> [A] city is under no obligation to sell or furnish water or sewer services to anyone outside its corporate limits, but, if it elects to do so, it acts in a *proprietary* capacity, and the relationship entered into between a city as a supplier and such users is purely contractual.

(Italics ours.) *Colorado Springs v. Kitty Hawk Dev. Co.,* 154 Colo. 535, 543, 392 P.2d 467, 471 (1964), *cert. denied,*

379 U.S. 647 (1965). "The only right . . . under the circumstances is to determine whether the City is complying with the terms of its contract . . ." *Colorado Springs,* at 543 (quoting *Phoenix v. Kasun,* 54 Ariz. 470, 97 P.2d 210, 214 (1939)).[5] Since the City was acting in its proprietary capacity when it entered into these water service contracts, it was free to bargain for and include in the contracts the covenant in question.

We also disagree with the Landowners' contention that the covenants violated public policy. While an agreement that interferes with constitutional rights may be contrary to public policy, we have already held that these freely given covenants do not abridge First Amendment rights.

4. Are the covenants invalid because they constitute waiver of *future* rights?

"[T]o constitute a waiver, the right or privilege claimed to have been waived must generally have been in existence at the time of the purported waiver." 28 Am Jur. 2d *Estoppel and Waiver* § 157, at 839 (1966) (citing *Bunge v. Brotherhood of Maintenance of Way Employes,* 178 Wash. 33, 33 P.2d 383 (1934)). The Landowners claim the contract provision whereby the Reeds' predecessors and the Krugers waived their right to oppose annexation was invalid because the waiver was made before the petition for annexation was filed.

---

[5]One of the cases relied upon by the Landowners is not distinguishable on the above ground. In *Edris v. Sebring Utils. Comm'n,* 237 So. 2d 585, 587 (Fla. Dist. Ct. App.), *cert. denied,* 240 So. 2d 643 (Fla. 1970), the utility had required the party seeking water service to purchase electrical service as well. The court held a public utility corporation cannot refuse to render service to persons *outside* its boundaries because of a collateral matter unrelated to the service, citing 43 Am. Jur. *Public Utilities and Services* § 23. We have read the corresponding section in Am. Jur. 2d (64 Am. Jur. 2d *Public Securities Obligations to Public Works and Contracts* § 18 (1972)) and we believe the cases cited there stand for the idea expressed in 5 E. McQuillin, at 316, that when a governmental entity is serving those *within* its political limits, it must act reasonably. *See, e.g., Seaton Mt. Elec. Light, Heat & Power Co. v. Idaho Springs Inv. Co.,* 49 Colo. 122, 111 P. 834, 835 (1910).

Here, the first notice of intent to commence annexation proceedings had been filed with the City Council in 1975. However, the Boundary Review Board denied annexation in February 1976. Notice of intent was refiled in 1979. This time, the City Council indicated it would accept annexation subject to certain conditions set by the City Plan Commission. On October 8, 1979, the Boundary Review Board also approved the proposed annexation.

The water service agreements were signed by the Reeds' predecessors in November 1982, and by the Krugers in August 1983. It was not until October 1983 that the first annexation petition was filed. That petition was submitted to the City Council in April 1984. It encompassed the same 251–acre tract described in the 1975 and 1979 notices of intent, but designated 8.7 acres in the northeast corner as "Phase II" to be annexed later. For reasons unrelated to this appeal that petition was determined to be defective. The instant petition was filed in June 1984. Again, it covered the same tract of land, but the "Phase II" designation was increased to 60 acres. Copies of the Reeds' and Krugers' water service agreements were attached to the petition and used as the equivalent of their signatures.

At the time the water service agreements in question were executed, the notice of intention to commence annexation proceedings had been filed with the City Council, and the City had indicated its willingness to accept annexation subject to certain conditions set by the City Plan Commission. Thus, the covenantors knew the circumstances under which the proposed annexation would take place and waived their right to oppose it. By the same token, they also waived their right to withdraw their names from a petition for annexation.

*Doan v. Fort Wayne,* 253 Ind. 131, 252 N.E.2d 415 (1969), relied upon by the Landowners, is distinguishable. There, the landowners had entered into water service agreements in which they waived their right to remonstrate versus annexation. The right to remonstrate is a statutory right in which landowners in an annexed area may seek

review of an annexation ordinance in court. If the remonstrance shows the annexation does not meet the statutory criteria, the ordinance falls. *Doan,* at 136–37, noted:

> [I]t is impossible to imagine how a landowner would know he were aggrieved or injuriously affected unless he knew *when* and under *what* circumstances prospective annexation were to take place. The statute provides that the remonstrance or complaint shall state the reason why such annexation ought not in justice take place. The right of remonstrance is designed to protect the landowner from injury arising out of annexation. Unless there is an annexation, there can be no injury, nor can there be any right to remonstrate.
>
> . . .
>
> . . . *In the instant case with one exception, all of the waivers were signed before any annexation was pending. Furthermore there is no evidence in the record to indicate that annexation was contemplated or that any of the signatories knew of any such plan.*

(Some italics ours.) In contrast, the annexation procedure had progressed far enough in this case so that the covenantors knew the details of the proposed annexation when they signed the water service agreements. They validly waived a known right.

5. Are the Reeds bound by the covenants signed by their predecessors?

The Landowners correctly point out that the original parties to the water service agreements were not in a privity of estate, *i.e.,* the covenant was not included in a conveyance of an estate in land nor did it relate to coexisting or common property interests. Horizontal privity of estate is one of the requirements for an agreement to run with the land and bind successors in interest. *Feider v. Feider,* 40 Wn. App. 589, 593, 699 P.2d 801 (1985) (citing Stoebuck, *Running Covenants: An Analytical Primer,* 52 Wash. L. Rev. 861 (1976–1977)).

Nevertheless, we note the water service agreements were filed with the County Auditor, so the Reeds at least had constructive notice of the covenant. They do not contend

that the City stopped serving their property with water once they purchased from their predecessors. We hold the Reeds ratified their predecessors' contract by accepting the city water service with constructive notice of the covenant. *See Swiss Baco Skyline Logging, Inc. v. Haliewicz,* 18 Wn. App. 21, 567 P.2d 1141 (1977).

6. Were the water service agreements illegal, thereby rendering the covenants void?

The Landowners have attached to their brief a copy of a decision of the Spokane County Boundary Review Board dated March 14, 1983, in which the Board disapproved an application by the City to install 12–inch, 18–inch and 24– inch water mains in Strong Road. The City already had in existence an 18–inch water main in Strong Road. The Superior Court held:

> No evidence is before this court that the City . . . proceeded to install the . . . additional mains. The mere fact that water service covenants . . . were signed after the date of the Boundary Review Board decision, does not support an inference that the City entered those contracts contrary to the decision of the Board and therefore illegally, because a water main was already in existence on Strong Road and Five Mile Road.

On appeal, the Landowners characterize the Boundary Review Board's decision as disapproving the extension of *any* permanent water service north of Strong Road. While there is language in the Board's written decision indicating there was insufficient evidence of a need for municipal services north of Strong Road, the proposal rejected by the Board was specifically for the *installation of water mains larger than 12 inches*. It appears city water was provided under the covenants in question without installing the larger mains disapproved by the Board.[6] Thus, the water

---

[6]Although the City must notify the Board of its intent to extend permanent water service outside of its boundaries, RCW 36.93.090(5), the members of the Board are not authorized to initiate review of such an extension when it is accomplished through installation of mains 6 inches or less in diameter. RCW 36.93.100(1)(b).

service agreements were not in contravention of the 1983 Boundary Review Board decision.

Accordingly, we hold the signature requirement of RCW 35.13.130 was met by the attachment of the water service covenants to the petition for annexation.

■ Second, were the 1979 notices of intent to the City Council and to the Boundary Review Board effective for the 1984 petition? The Landowners answer "no", even though the statutes do not set a minimum time period for filing a petition for annexation following City Council and Boundary Review Board approval. Their position is that the approvals of the earlier annexation proposal were not effective for the 1984 petition because it differed significantly from the 1979 proposal. According to the Landowners, the changes included: (1) an introduction of a phasing plan with a resulting reduction in acreage to be initially annexed and a loss of natural boundaries; (2) a change of zoning; and (3) a failure to provide for agricultural uses. We do not view the differences between the two proposals as material.

Under RCW 35.13.150, the City Council may annex "all or any portion of the proposed area . . ." The Landowners argue that the statute permits the *City Council* to annex a smaller area than requested, but it does not empower the *petitioners,* unilaterally, to reduce the size of the proposed annexation. However, the Legislature's grant of this authority to the City Council is evidence that it did not regard a reduction in the area annexed to be a material change. Otherwise, it also would have required the City Council to refer the matter back to the City Plan Commission and the Boundary Review Board before it acted.

Nor do the land use changes necessitate reconsideration by the Boundary Review Board. The 1984 proposal provides for less dense residential development than that contemplated if the area remained outside the city limits and was governed by the current county comprehensive plan. Also, some agricultural uses are permitted in the zone. In any event, land use decisions are not a function of the

Boundary Review Board. *Spokane Cy. Fire Protec. Dist. 9 v. Spokane Cy. Boundary Review Bd.*, 97 Wn.2d 922, 924, 652 P.2d 1356 (1982).

The judgment of the Superior Court is affirmed.

GREEN and THOMPSON, JJ., concur.