162 P.3d 1277

KAANAPALI HILLSIDE HOME-OWNERS' ASSOCIATION, a Hawai'i nonprofit corporation, by and through its BOARD OF DIRECTORS, Petitioner/Plaintiff–Appellee

v.

Dana D. DORAN; Michael P. Doran, Respondents/Defendants–Appellants

American Savings Bank, F.S.B., a federal savings bank, Respondent/Defendant–Appellee

John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Doe Entities 1–10; Doe Governmental Agencies 1–10; and Doe Eleemosynary Corporations 1–10, Defendants.

No. 25585.

Supreme Court of Hawai'i.

June 21, 2007.

Joyce Y. Neeley, and Philip L. Lahne (of Neeley & Anderson LLP), Honolulu, for petitioner/plaintiff-appellee on the application.

Dana D. Doran, and Michael P. Doran, respondents/defendants-appellants, pro se, on the response.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Petitioner/Plaintiff–Appellee Kaanapali Hillside Homeowners' Association [hereinafter, KHHA] filed a timely Application for Writ of Certiorari (Application) seeking review of: (1) the November 3, 2006 judgment of the Intermediate Court of Appeals (ICA) on its published opinion in *Kaanapali Hillside Homeowners' Ass'n v. Doran*, 112 Hawai'i 356, 145 P.3d 899 (App.2006) [hereinafter, *KHHA I*], which (a) affirmed in part the

November 26, 2002 final judgment of the Circuit Court of the Second Circuit [1] in favor of KHHA, but (b) vacated that portion of the judgment awarding fees and costs to KHHA and remanded for redetermination of the appropriate amount of fees and costs; and (2) the ICA's subsequent "Order Approving in Part and Denying in Part [KHHA]'s Request for Attorney's Fees and Costs" [hereinafter, fees and costs order]. KHHA asserts that the ICA gravely erred in: (1) holding that (a) KHHA is not a "planned community association" as defined by Hawai'i Revised Statutes (HRS) § 421J–2 (Supp.2002), and thus, (b) KHHA is not entitled to recover the fees it incurred in the circuit court pursuant to HRS § 421J–10 (Supp.2002); [2] and (2) holding in its fees and costs order that (a) KHHA is not a "planned community association" as defined by HRS § 607–14 (Supp.2006), [3] and thus, (b) the amount that KHHA can recover in fees cannot exceed twenty-five per cent of the judgment. We accepted KHHA's Application. We now: (1) affirm the ICA's November 3, 2006 judgment, but for the reasons stated herein, and therefore vacate the circuit court's judgment with respect to its award of fees and costs and remand with instructions; and (2) reverse the ICA's fees and costs order with respect to its award of fees.

1. The Honorable Joseph E. Cardoza presided over this matter.

2. HRS § 421J–10 states, in relevant part:
   (a) All costs and expenses, including reasonable attorneys' fees, incurred by or on behalf of the association for:
   (1) Collecting any delinquent assessments against any unit or the owner of any unit;
   (2) Foreclosing any lien on any unit; or
   (3) Enforcing any provision of the association documents or this chapter;
   against a member, occupant, tenant, employee of a member, or any other person who in any manner may use the property, shall be promptly paid on demand to the association by such person or persons....

3. HRS § 607–14 states, in pertinent part:
   In all the courts, in all actions in the nature of assumpsit ... there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; ... *provided that this amount*

## I. BACKGROUND

The following are relevant portions of the facts and procedural history as set forth by the ICA.

### A. The Declaration and First Amended Declaration

On December 15, 1972, pursuant to an agreement of sale, Pioneer Mill Company, Limited (Pioneer) sold 70 acres of land on Maui (the Property) to Ohbayashi Hawaii Corporation (OHC).[4] The bulk of the Property was used to develop the [Kaanapali Hillside Subdivision (hereinafter, Subdivision)]. On June 19, 1980, Pioneer recorded a Declaration of Covenants and Restrictions (Declaration) against the Property. Later that day, in satisfaction of the agreement of sale, a deed was recorded conveying the Property to OHC, subject to the Declaration.

On July 16, 1982, Pioneer and OHC recorded a First Amendment of Declaration of Covenants and Restrictions (First Amended Declaration), which completely amended and replaced the Declaration. *The First Amended Declaration imposed various covenants and restrictions relating to land use and to permissible architecture, structures, and landscaping within the Property.* The First Amended Declaration declared that the covenants

*shall not exceed twenty-five per cent of the judgment.*

....

*Nothing in this section shall limit the recovery of reasonable attorneys' fees and costs by a planned community association and its members in actions for the collection of delinquent assessments, the foreclosure of any lien, or the enforcement of any provision of the association's governing documents, or affect any right of a prevailing party to recover attorneys' fees in excess of twenty-five per cent of the judgment pursuant to any statute that specifically provides that a prevailing party may recover all of its reasonable attorneys' fees. "Planned community association" for the purposes of this section means a nonprofit homeowners or community association existing pursuant to covenants running with the land.*
(Emphases added.)

4. The agreement of sale stated that the Property was subject to the "Declaration of Covenants and Restrictions," which was attached as an exhibit and later recorded on June 19, 1980.

and restrictions were "in furtherance of a common building scheme hereby imposed on the Property . . . for the purpose of enhancing and protecting the value, desirability and attractiveness of the Property." It further provided that the *covenants and restrictions "shall run with the land and shall be binding on all parties having or acquiring any right, title or interest in the Property or any part thereof."*

Under the First Amended Declaration, all structures built, improvements made, and landscaping done in the Property were subject to Pioneer's prior approval. Pioneer was authorized to assign its rights and duties under the First Amended Declaration "at any time" and "to any party." Pioneer, OHC, and any lot owner in the Property were authorized to bring a civil action to enforce compliance with the covenants and restrictions set forth in the First Amended Declaration. The First Amended Declaration did not include a provision establishing a procedure by which its terms could be amended.

*KHHA I*, 112 Hawai'i at 357–58, 145 P.3d at 900–01 (emphases added) (footnote omitted) (some alterations in original).

### B.   *The Incorporation of KHHA, Its Charter, and Its By–Laws*

On October 1, 1982, employees of OHC filed a Petition for Charter of Incorporation with the Department of Regulatory Agencies (now known as the Department of Commerce and Consumer Affairs), State of Hawai'i, seeking to form KHHA as a non[ ]profit corporation. The petition was granted.  KHHA's Charter of Incorporation (Charter) . . . . provided that each owner of a lot in the Subdivision "shall automatically become a member of [KHHA] and shall be entitled to and be bound by all the rights, duties, privileges and obligations of a member" as established by the Charter, the By–Laws of KHHA, and any rules and regulations adopted by KHHA. The Charter granted various powers to KHHA, including the following express powers:

(d) It may fix, levy, collect, and enforce payment of, by any lawful means,

any and all charges and assessments against its members . . . .

(e) It may adopt rules and regulations governing the facilities, properties, easements, and other areas owned and/or maintained and operated by [KHHA].

(f) It may, but shall not be obligated to, take such action as is deemed necessary to enforce any recorded or unrecorded covenants and restrictions governing the use of the property within the Subdivision, including, but not limited to, the Declaration of Covenants and Restrictions . . . as same may be amended from time to time.

KHHA's By–Laws provided, among other things, that

[t]he rights of membership [in KHHA] are subject to the payment of assessments levied by [KHHA], the obligation of which assessments is imposed against each Owner of and becomes a lien upon the lot against which such assessments are made . . . .

*Neither OHC nor Pioneer recorded KHHA's Charter or By[-L]aws against title to the lots in the Subdivision in the Bureau of Conveyances of the State of Hawai'i.   The Declaration and the First Amended Declaration, which were recorded, do not mention KHHA or refer to the power of a homeowners' association to levy assessments on lot owners in the Subdivision.*

*KHHA I*, 112 Hawai'i at 358–59, 145 P.3d at 901–02 (emphasis added) (some alterations in original).

### C.   *The Partial Assignment and Other Services Provided by KHHA*

Since [March 27, 1986], KHHA has maintained . . . a private park available for use by KHHA members only.  The park contains improvements such as walkways, lights, benches, picnic tables, grass, trees, and hedges which require regular expenditures for repair, maintenance, and replacement.  The park has been a benefit to lot owners in the Subdivision.  It has been used by lot owners for recreational activities and has provided open space for the Subdivision.

On June 20, 1988, a Partial Assignment of Declaration of Covenants and Restrictions (Partial Assignment) was recorded in the Bureau of Conveyances. *Pursuant to the Partial Assignment, Pioneer assigned and transferred to KHHA all of Pioneer's rights, duties, and obligations under the Declaration and First Amended Declaration as they pertained to the Subdivision property.* KHHA agreed to enforce each of the provisions, covenants, and conditions of the Declaration and First Amended Declaration and to indemnify Pioneer against any loss or damage arising from KHHA's failure to do so. OHC consented to and joined in the Partial Assignment.

By virtue of the Partial Assignment, KHHA has been responsible since 1988 for reviewing and approving architectural plans for improvements to lots submitted by lot owners. KHHA has monitored construction of the improvements to ensure compliance with the approved plans and specifications. KHHA has also enforced the other covenants and restrictions contained in the First Amended Declaration. It has incurred expenses in resolving disputes relating to its architectural review decisions and its enforcement of covenants and restrictions, including pursuing and defending against lawsuits arising out of these matters.

In addition to maintaining the park, reviewing and approving plans for proposed improvements, and enforcing the covenants and restrictions in the First Amended Declaration, KHHA has provided other services that benefit the Subdivision. Among other things, KHHA has maintained a planting screen easement and landscaping along public rights of way, including an irrigation system and fences within the landscaped area. It has cleaned unkempt vacant lots by mowing them and removing rubbish. KHHA also maintained the roads in the Subdivision until the roads were dedicated to the County of Maui in April 1990. KHHA has imposed assessments against lot owners and collected such assessments to fund its activities since October 1, 1983.

*KHHA I*, 112 Hawai'i at 360, 145 P.3d at 903 (emphasis added).

## D. *The Dorans' Purchase of Their Lot*

On July 5, 1996, [Respondents/Defendants–Appellants Dana D. Doran and Michael P. Doran] became the owners of Lot No. 42 in the Subdivision when their warranty deed was recorded. Prior to purchasing their lot, the Dorans had actual and constructive notice of the existence of KHHA. *The Dorans' warranty deed stated that their lot was subject to the Declaration, the First Amended Declaration, and the Partial Assignment. The Partial Assignment identified KHHA as the organization responsible for enforcing the covenants and restrictions in the Declaration and First Amended Declaration.* The Dorans' warranty deed, however, did not state that their lot was subject to KHHA's Charter or By-[L]aws.

Prior to closing, the Dorans received documents which referred to KHHA, the mandatory nature of membership in KHHA, and the obligation to pay assessments for services provided by KHHA. In particular, the Dorans admit they received copies of KHHA's Charter and By-[L]aws before they purchased. The Dorans' Deposit Receipt Offer and Acceptance (DROA) stated that "Maintenance Fees are $240.00 paid quarterly," and their escrow settlement statement reflected the apportionment of the $240.00 quarterly maintenance fee with the seller. The Dorans' DROA notified them that their obligation to purchase was contingent on their review of homeowner organization documents, including the articles of incorporation, [B]y-[L]aws, minutes of the last annual meeting, and financial statements. The Dorans also executed a mortgage dated July 1, 1996, that contained a planned unit development (PUD) rider, which stated that the Dorans' property was part of a PUD. The PUD rider required the Dorans to perform all their obligations under PUD's "Constituent Documents," which were defined to include the owners association's articles of incorporation and [B]y-[L]aws. The Dorans were required to "promptly pay, when due, all dues and

assessments imposed pursuant to the Constituent Documents."

At trial, Michael Doran testified that at the time he purchased his home, he was under the impression that the Subdivision was a PUD, that membership in KHHA was mandatory, and that he was obligated to pay assessments to KHHA. From July 1996 through March 1999, the Dorans paid assessments to KHHA, participated in KHHA meetings, and even requested that KHHA enforce the land use restrictions contained in the First Amended Declaration against other lot owners. In February 1999, however, the Dorans circulated a newsletter to homeowners disputing the authority of KHHA to collect assessments. The Dorans stopped paying their assessments and demanded that KHHA refund the assessments they had previously paid. On June 22, 1999, the Dorans sued KHHA in small claims court seeking the return of assessments paid to KHHA. The suit was later dismissed.

*KHHA I*, 112 Hawai'i at 360–61, 145 P.3d at 903–04 (emphasis added).

E.  *The Circuit Court Proceedings*

On August 2, 1999, KHHA filed a complaint in circuit court against the Dorans, American Savings Bank, F.S.B. (American Savings), and various Doe individuals and entities. KHHA sought: 1) a judgment declaring that the Dorans were obligated to pay assessments (Count 1); 2) an injunction ordering the Dorans to pay assessments (Count 2); 3) a lien against the Dorans' lot for the assessments and other charges due and owing (Count 3); 4) a judgment against the Dorans for the assessments and other charges due and owing (Count 4); 5) a judgment estopping the Dorans from refusing to pay assessments and other charges due (Count 5); 6) a foreclosure sale of the Dorans' lot as a means of collecting the outstanding fees and charges (Count 6); and 7) an award of attorney's fees and costs (Count 7). KHHA's claims against American Savings were later voluntarily dismissed by stipulation.

On May 4, 2000, Judge Artemio Baxa entered an order granting the Dorans' mo-

tion for partial summary judgment and dismissing Count 6 of the complaint (the foreclosure count) with prejudice. In the order, Judge Baxa found:

1. That Plaintiff is not an "association" within the meaning of ... [HRS] [c]hapter 421J [2004].

2. The mandatory membership in Plaintiff and any obligation to pay assessments is not a real covenant running with the land at law.

3. That there is not and has never been any present, valid, existing lien on Defendant's property in favor of Plaintiff.

After a bench trial before Judge Cardoza held in August and September of 2002, Judge Cardoza ruled in favor of KHHA on all the remaining counts. Judge Cardoza entered a Final Judgment in favor of KHHA that: 1) declared that the Dorans are required to pay their share of the costs of maintaining the common area and administering the Subdivision; 2) granted injunctive relief ordering the Dorans to comply with their payment obligations as long as they own Lot 42; 3) determined that KHHA has a lien on the Dorans' lot for unpaid assessments and other charges due and owing and a right to enforce the lien; 4) entered a monetary judgment in the sum of $6,411.23, representing accrued assessments of $5,150, late fees of $775, and interest of $486.23; 5) entered judgment equitably or otherwise estopping the Dorans from refusing to pay assessments and other charges due to KHHA; and 6) entered a monetary judgment in favor of KHHA for its legal fees of $281,297.35 and its costs of $44,255.71.

In the Final Judgment, Judge Cardoza acknowledged the prior dismissal of KHHA's foreclosure count by Judge Baxa but ruled that KHHA is not precluded from attempting to enforce its lien for unpaid assessments and other charges under any available remedies, including foreclosure. In his post-trial "Findings of Fact and Conclusions of Law and Order," Judge Cardoza also reconsidered and reversed the earlier findings made by Judge Baxa when Judge Baxa granted the Do-

rans' motion for partial summary judgment and dismissed the foreclosure count. Judge Cardoza concluded that: 1) KHHA is an association within the meaning of HRS [c]hapter 421J (2004); 2) that mandatory membership in KHHA and the obligation to pay assessments are covenants running with the land; and 3) KHHA has a valid lien on the Dorans' lot to secure payment of assessments. Judge Cardoza's determination that KHHA was an association under HRS [c]hapter 421J was particularly significant because it provided a statutory basis for KHHA to seek full recovery of its attorney's fees and costs.

*KHHA I,* 112 Hawai'i at 361–62, 145 P.3d at 904–05 (some alterations in original).

F. *The Appeal and the ICA's Published Opinion and Fees and Costs Order*

The Dorans appealed, *pro se,* alleging twenty-five points of error, the relevant portions of which can be distilled into the following two contentions: (1) the Dorans are not obligated to pay assessments to KHHA because the Declaration and First Amended Declaration do not mention KHHA and do not impose an obligation upon lot owners to pay assessments; and (2) the circuit court erred in awarding attorneys' fees and costs pursuant to HRS § 421J–10 because KHHA does not meet the HRS chapter 421J definition of "association." With respect to the first issue, the ICA affirmed the circuit court's November 26, 2002 judgment, holding that "under the circumstances of this case, the Dorans implicitly contracted and agreed to pay the assessments authorized under KHHA's Charter and By-[L]aws. The Dorans were bound by an implied obligation to pay their share of the costs incurred by KHHA in providing services that benefitted the Subdivision." *KHHA I,* 112 Hawai'i at 363, 145 P.3d at 906.

In regard to the second issue, the ICA vacated that portion of the circuit court's judgment awarding fees and costs to KHHA and remanded for redetermination of the appropriate amount of fees and costs. *Id.* at 365–67, 145 P.3d at 908–10. The ICA reasoned that KHHA was not entitled to fees and costs under HRS § 421J–10 because KHHA did not meet the HRS § 421J–2 defi-

nition of "association" inasmuch as there were no *recorded* instruments that granted KHHA the authority to impose on units or on the owners or occupants of the lots, any mandatory payment of money. *Id.* The ICA rejected KHHA's argument that the First Amended Declaration—because it required a lot owner seeking architectural approval for planned improvements from KHHA to bear all costs incurred in connection with the review and approval process, and authorized KHHA to bring a civil action to enforce land use and architectural restrictions against a lot owner who violated such restrictions and to recover damages and attorney's fees in such an action—created such authority in KHHA. *Id.* at 366, 145 P.3d at 909. Specifically, the ICA stated:

We agree with the Dorans that KHHA's ability to require a lot owner to pay the costs associated with architectural approval for desired improvements to his or her own lot does not demonstrate that KHHA had the authority to impose on *lot owners* a "mandatory payment of money as a regular annual assessment or otherwise" under the HRS § 421J–2 definition of "declaration." Nor is the statutory definition satisfied by KHHA's ability to collect damages or attorney's fees in a civil suit to enforce land use and architectural restrictions. Under the First Amended Declaration, as assigned, KHHA did not have the authority to impose a "mandatory payment" on lot owners because KHHA could not compel lot owners to pay any money. Only the particular lot owner who sought architectural approval for desired improvements or who violated a restrictive covenant was obligated to pay.

As we construe the HRS § 421J–2 definition of "declaration," the recorded instruments must give the association the power to require lot owners, on a collective basis, to pay for the services rendered by the association. The ability to demand payment from an individual lot owner for a specific service requested by that lot owner or as a sanction for that lot owner's violation of the restrictive covenants is not enough. Otherwise, the statute's use of the plural form of the term "units" in referring to "the authority in the associa-

tion to impose on units" and the statute's use of the term "mandatory" to describe the "payment of money" would be superfluous. *See Camara v. Agsalud,* 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984) ("It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute."). Although KHHA's *unrecorded* Charter and By-[L]aws provided that KHHA had the authority to impose mandatory payments of money on lot owners, the instruments that had been *recorded* against the Subdivision lots did not.

*Id.* (footnotes omitted) (emphases in original).

The ICA entered its judgment on appeal on November 3, 2006. On November 14, 2006, KHHA filed a request for attorneys' fees and costs incurred on appeal, noting that HRS § 607–14 provided a basis for an award of fees to KHHA. KHHA also asserted that because it was a "planned community association" for purposes of HRS § 607–14, its fee award was not subject to HRS § 607–14's cap of twenty-five per cent of the judgment. KHHA reasoned that, "whether or not KHHA is a planned community association for the purposes of [HRS] [c]hapter 421J . . . is irrelevant to its entitlement to an award of all of its reasonable attorneys' fees and costs pursuant to [HRS] § 607–14" because the definition of "planned community association" in HRS § 607–14 was significantly broader than the definition in HRS chapter 421J. On December 29, 2006, the ICA granted in part KHHA's request for fees and costs pursuant to HRS § 607–14 and Hawai'i Rules of Appellate Procedure Rule 39, but capped

KHHA's award of fees at twenty-five per cent of the judgment based on its conclusion, without discussion, that KHHA was not a "planned community association" as defined by HRS § 607–14.

### G. *Application for Writ of Certiorari*

KHHA filed this timely Application on January 30, 2007, and the Dorans filed their response on February 14, 2007. We accepted certiorari by order dated March 8, 2007. On March 16, 2007, the Dorans filed a "Motion for an Order Permitting the Filing of a Supplemental Brief," and on March 19, 2007, KHHA filed a "Motion for Leave to File Supplemental Brief." By order dated March 20, 2007, this court granted both parties' motions. On April 2, 2007, KHHA filed its supplemental brief, alleging: (1) public policy supports the circuit court's decision that KHHA falls within the scope of the statutory definitions of a "planned community association"; (2) KHHA is a planned community association under HRS chapter 421J; (3) the Dorans should not be permitted to make new arguments in their response; (4) KHHA is a planned community association under HRS § 607–14; and (5) the Dorans misinterpret the ICA's decision and attempt to raise issues not before this court. The Dorans filed their supplemental brief *ex officio* on April 2, 2007, contending: (1) the ICA correctly determined that KHHA is not a planned community association under HRS chapter 421J;[5] and (2) the ICA committed plain error in determining that the Dorans have an implied obligation to pay assessments.[6]

### II. *STANDARD OF REVIEW*

Statutory interpretation is "a question of law reviewable *de novo.*" *State v. Levi,* 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). This court's

---

5. In their supplemental brief, the Dorans direct this court's attention to a failed legislative bill, which would have amended the definition of "planned community association" in HRS § 421J–2 and HRS § 607–14. Such citation will not be discussed further inasmuch as it is in contravention of HRS § 641–2 (Supp.2006), which states that "[e]very appeal shall be taken on the record, and no new evidence shall be introduced in the supreme court."

6. Because the Dorans did not apply for a writ of certiorari to review the ICA's determination that the Dorans have an implied obligation to pay assessments, and because we perceive no plain error, we will not address this argument further herein. *See State v. Bolosan,* 78 Hawai'i 86, 89, 890 P.2d 673, 676 (1995) ("When a party fails to properly challenge a ruling of the ICA, we ordinarily will not address that ruling absent plain error." (Citing *State v. Elliott,* 77 Hawai'i 309, 310 n. 1, 884 P.2d 372, 373 n. 1 (1994).)).

statutory construction is guided by established rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Peterson v. Hawaii Elec. Light Co., Inc.*, 85 Hawai'i 322, 327–28, 944 P.2d 1265, 1270–71 (1997), *superseded on other grounds by* HRS § 269–15.5 (Supp.1999) (block quotation format, brackets, citations, and quotation marks omitted).

## III. *DISCUSSION*

A. *KHHA is Not a "Planned Community Association" as Defined in HRS Chapter 421J and Thus is Not Entitled to Recover the Fees It Incurred in the Circuit Court Pursuant to HRS § 421J–10.*

■ KHHA asserts that the ICA gravely erred in holding that (1) KHHA is not a "planned community association" as defined in HRS chapter 421J, and thus, (2) KHHA is not entitled to recover the fees it incurred in the circuit court pursuant to HRS § 421J–10. We disagree.

HRS 421J–2 defines "association" as "a nonprofit, incorporated, or unincorporated organization upon which responsibilities are imposed and to which *authority is granted in a declaration* which governs a planned community."[7] (Emphasis added.) In turn, "declaration" is defined as:

> any *recorded* instrument, however denominated, that imposes on an association maintenance or operational responsibilities for the common area and *creates the authority in the association to impose on units, or on the owners or occupants of the units, any mandatory payment of money as a regular annual assessment or otherwise in connection with the provisions, maintenance, or services for the benefit of some or all of the units, the owners, or occupants of the units or the common areas.* A declaration includes any amendment or supplement to the instruments described in this definition.

HRS § 421J–2 (emphases added).

The question here is whether the First Amended Declaration, which is the only relevant instrument that is *recorded*, creates in KHHA the authority as required by the defi-

---

7. A "planned community," the definition of which is not at issue here, is:

a common interest community, other than a condominium or a cooperative housing corporation or a time share plan, which includes all of the following characteristics:

(1) Real property subject to a recorded declaration placing restrictions and obligations on the owners of the real property and providing for rights and responsibilities of a separate entity, the association:

(A) Which owns and maintains certain property within the planned community for the common use or benefit, or both, of the owners of units within the planned community;

(B) Which is obligated to maintain certain property it does not own within the planned community for the common use or benefit,

or both, of the owners of units within the planned community; or

(C) Which is obligated to provide services to any such owners or units;

(2) Individual owners own separate units which are part of a planned community at least some of which are improved by or are to be improved by residential dwellings;

(3) Owners have automatic and non-severable membership in an association by virtue of ownership of units within the planned community; and

(4) Owners, other than a master developer or declarant, are obligated to pay mandatory assessments by virtue of ownership of a unit within the planned community.

HRS § 421J–2.

nition of "declaration" set forth above.[8] The portion of the First Amended Declaration that KHHA contends constitutes such a grant of authority states:

> 2. *Architectural Control.* No structure shall be erected, placed or altered on the Property until the plans and specifications therefor have been submitted to and approved by [KHHA].... *The owner or other party seeking architectural approval from [KHHA] will bear all costs, including reasonable architects, engineers, attorneys and overhead charges, incurred in connection with reviewing and approving plans and specifications.*

(Emphasis added.) We disagree that a requirement that a lot owner "bear all costs" incurred in connection with the review and approval of that lot owner's proposed architectural plans is equivalent to a grant of authority to "impose ... [a] mandatory payment of money as a regular annual assessment or otherwise in connection with the provisions, maintenance, or services for the benefit of some or all of the units, the owners, or occupants of the units or the common areas." Notwithstanding the statute's use of broad terminology such as "or otherwise" and "some or all," KHHA's argument asks this court to stretch the language of HRS

§ 421J–2 beyond its reasonable interpretation.[9] Clearly, the statute meant to encompass instruments with language such as that used in KHHA's unrecorded Charter— "[KHHA] may fix, levy, collect, and enforce payment of, by any lawful means, any and all charges and assessments against its members[.]" Because the Charter was not recorded, however, and because KHHA's First Amended Declaration cannot reasonably be interpreted as creating the requisite authority in KHHA, the ICA did not gravely err in concluding that KHHA is not an "association" under the plain meaning of HRS § 421J–2.[10] Consequently, the ICA did not gravely err in concluding that KHHA is not entitled to fees and costs pursuant to HRS § 421J–10.

### B. *Fees and Costs on Remand*

While we agree with the ICA that KHHA is not entitled to fees and costs pursuant to HRS § 421J–10 and that the matter should be remanded, we write to clarify the extent to which attorneys' fees and costs may be awarded. We emphasize, that, on remand, the circuit court is limited to redetermining an award of fees and costs pursuant only to those grounds upon which KHHA had previously relied. Remand is not an opportunity

---

8. The Dorans also argue that there is no recorded instrument "that imposes on an association maintenance or operational responsibilities for the common area" as required by the first part of the definition of "declaration." This argument, however, need not be discussed further herein because our holding that the First Amended Declaration does not create in KHHA the authority required by the second part of the definition is dispositive.

9. KHHA takes issue with the ICA's conclusion that "the recorded instruments must give the association the power to require lot owners, on a collective basis, to pay for the services rendered by the association." *KHHA I*, 112 Hawai'i at 366, 145 P.3d at 909. We agree with the ICA that the plain meaning of the statute requires that the recorded instruments authorize the association to impose on *multiple units, owners,* or *occupants* mandatory payments of money in connection with services for the benefit of "some or all [*i.e.,* not just one] of the *units,* the *owners,* or *occupants.*" HRS § 421J–2 (emphases added).

10. KHHA's argument that public policy favors supporting the legal framework of community associations is duly noted. Indeed, this is not a

situation wherein an organization failed to attain status as a "planned community association" because it overlooked the statute's requirements. Rather, it appears that HRS chapter 421J was enacted approximately fifteen years after the incorporation of KHHA. Thus, it is possible that the legislature, in enacting HRS chapter 421J, intended that existing organizations such as KHHA—*i.e.,* organizations that would be "associations" pursuant to chapter 421J but for the failure to include the assessment power in a recorded instrument—would fall under chapter 421J. However, even if we believe that the legislature intended to include organizations such as KHHA under HRS § 421J–2's definition of "association," we cannot depart from the plain and unambiguous language requiring that the instrument granting the required authority must be recorded. *See State v. Dudoit,* 90 Hawai'i 262, 271, 978 P.2d 700, 709 (1999) ("We do not legislate or make laws. Even where the Court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used." (Quoting *State v. Meyer,* 61 Haw. 74, 77, 595 P.2d 288, 291 (1979).) (Emphasis omitted.)).

for KHHA to be awarded fees and costs based on other grounds upon which it could have raised earlier, but did not.

#### 1. Fees

■ Aside from HRS § 421J–10, KHHA requested fees based on HRS § 607–14.5 and also specifically requested $2,995.06 in fees pursuant to the circuit court's March 20, 2000 order finding that the Dorans violated Hawaiʻi Rules of Civil Procedure (HRCP) Rule 11 and granting KHHA's request for sanctions to include attorneys' fees and costs. Because the Dorans did not appeal the circuit court's award of $2,995.06 in fees based on the sanctions order, limiting their appeal to the circuit court's determination that KHHA was entitled to fees pursuant to HRS § 421J–10, KHHA is entitled to this amount.

Therefore, on remand, the circuit court is instructed to award KHHA fees in the amount of $2,995.06, and determine whether and to what extent KHHA is entitled to additional fees based on HRS § 607–14.5.

#### 2. Costs

■ Although KHHA is not entitled to costs under HRS § 421J–10, KHHA also requested costs in the circuit court pursuant to HRCP Rule 54 and HRS § 607–9 (1993).[11] However, because, as recognized by the ICA, "[t]he circuit court's award of $44,225.71 in costs included items … that KHHA only argued were authorized under HRS § 421J–10[,]" *KHHA I*, 112 Hawaiʻi at 364–65, 145 P.3d at 907–08, the ICA did not err in vacating the circuit court's order of costs and remanding for recalculation of costs pursuant to HRCP Rule 54 and HRS § 607–9. We therefore affirm that portion of the ICA's judgment that vacated the circuit court's award of costs.

C. *KHHA is a "Planned Community Association" as Defined in HRS § 607–14 and Thus is Entitled to Recover Reasonable Fees and Costs Incurred on Appeal.*

■ KHHA also argues that the ICA gravely erred in holding in its December 29,

2006 fees and costs order that, because KHHA is not a "planned community association" as defined in the assumpsit statute, HRS § 607–14, *supra* note 3, "the attorney's fees that may be awarded [to KHHA] pursuant to HRS § 607–14 are limited to twenty-five per cent of the judgment." Notwithstanding the ICA's conclusion that KHHA is not a "planned community association" as that phrase is utilized in HRS chapter 421J, KHHA argues that it is a "planned community association" as that phrase is defined in HRS § 607–14. KHHA therefore asserts that it is not subject to the twenty-five per cent cap on its fees and costs incurred on appeal. We agree.

#### 1. The definition of a "planned community association" in HRS § 421J–2 differs from the definition of that phrase in HRS § 607–14.

KHHA points out that in contrast to the definition of "planned community association" set forth in HRS § 421J–2 discussed in Section III.A, *supra*, HRS § 607–14 provides a significantly broader definition: " 'Planned community association' *for the purposes of this section* means a nonprofit homeowners or community association existing pursuant to covenants running with the land." HRS § 607–14 (emphasis added). HRS chapter 421J was created by the same Act that amended HRS § 607–14 to include an exception to the twenty-five per cent cap for planned community associations. 1997 Haw. Sess. L. Act 132, §§ 1–2 at 247–53. KHHA argues that because the legislature defined the same phrase differently in the same Act, the legislature intended different definitions. The Dorans appear to counter that, because the ICA concluded that KHHA is not a planned community association under HRS chapter 421J, it cannot be a planned community association under HRS § 607–14. Based on the following, we agree with KHHA.

---

**11.** HRS § 607–9 provides in relevant part:

All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other inci-

dental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs.

It must be presumed that in defining the phrase "planned community association" when the legislature amended HRS § 607–14 in Section 2 of Act 132, the legislature knew the definition it assigned to that phrase in Section 1 of the same Act, which would create chapter 421J. *Cf. Tamashiro v. Dep't of Human Servs.*, 112 Hawai'i 388, 427, 146 P.3d 103, 142 (2006) (stating that "the legislature is presumed to know the law when enacting statutes") (quoting *Agustin v. Dan Ostrow Constr. Co., Inc.*, 64 Haw. 80, 83, 636 P.2d 1348, 1351 (1981)). Thus, had the legislature intended that the definition of a "planned community association" be the same for both statutes, the legislature could have defined the phrase in HRS § 607–14 by reference to the definition in chapter 421J. The legislature did not. Rather, in defining the phrase in HRS § 607–14, the legislature used the language "for the purposes of this section," expressly indicating that the legislature intended a different definition. *See State v. Kalani*, 108 Hawai'i 279, 283–84, 118 P.3d 1222, 1226–27 (2005) ("[C]ourts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." (Citations omitted.)). *Cf. Rodrigues v. State*, 52 Haw. 156, 168, 472 P.2d 509, 518 (1970) (stating that "*in the absence of an express intention to the contrary,* words or phrases used in two or more sections of a statute are presumed to be used in the same sense throughout") (quoting *Gaspro, Ltd. v. Comm'n of Labor & Indus. Rel.*, 46 Haw. 164, 377 P.2d 932 (1962)). Thus, notwithstanding the fact that the word "association" is used in HRS § 607–14's definition, it does not have the same meaning as "association" as defined by HRS § 421J–2. Because the legislature utilized different definitions within the same Act, it may reasonably be inferred that the legislature ultimately decided

to implement a broader definition in HRS § 607–14. This court need not determine why the legislature acted as it did;[12] it suffices to conclude that, although KHHA may not be a "planned community association" for purposes of HRS chapter 421J, it can be a "planned community association" for purposes of HRS § 607–14.

**2. KHHA is a "planned community association" pursuant to HRS § 607–14 and is thus not subject to the twenty-five per cent cap on its award of fees.**

We next address whether KHHA is a planned community association pursuant to HRS § 607–14 such that it is not subject to the twenty-five per cent cap on its award of fees. As set forth above, HRS § 607–14 defines a "planned community association" as "a nonprofit homeowners or community association existing pursuant to covenants running with the land." There is no dispute that KHHA is a nonprofit organization. The question that remains is whether KHHA "exist[s] pursuant to covenants running with the land."

According to the Charter, KHHA exists for the purpose of, *inter alia,* "provid[ing] for the management, maintenance, protection, preservation, administration, and development of the [Subdivision,]" and has the power to, *inter alia,* "take such action as is deemed necessary to enforce any recorded or unrecorded covenants and restrictions governing the use of the property within the Subdivision, including, but not limited to, the Declaration of Covenants and Restrictions ... as same may be amended from time to time." The First Amended Declaration sets forth various covenants, and pursuant to the Partial Assignment, also provides that KHHA is authorized to enforce such covenants. Based on the following analysis, it is clear that these covenants run with the land such that KHHA falls within the definition of

---

**12.** HRS chapter 421J was enacted in 1997 and applies to "all planned community associations existing as of June 16, 1997 and all planned community associations created thereafter." HRS § 421J–1 (Supp.2002). KHHA was incorporated in 1982. Perhaps the legislature contemplated that some groups would not qualify as

"associations" as defined by HRS chapter 421J, but still wanted to allow the full recovery of attorneys' fees—*i.e.,* not subject to the twenty-five per cent cap under HRS § 607–14—to the prevailing party in litigation involving those organizations.

a "planned community association" as set forth in HRS § 607–14.

Our discussion begins with *Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership,* in which we stated that "[f]or a covenant to run with the land: (1) it must 'touch and concern' the land; (2) the covenanting parties must intend it to run with the land; and (3) there must be privity of estate." 75 Haw. 370, 383, 862 P.2d 1048, 1057 (1993) (quoting *Flying Diamond Oil Corp. v. Newton Sheep Co.,* 776 P.2d 618, 623 (Utah 1989)). Although *Waikiki Malia* is distinguishable from the instant case insofar as the issue in that case was the enforceability of a covenant against a party as opposed to the interpretation of a statute, we look to the three-prong *Waikiki Malia* analysis for guidance.

Here, with respect to the first requirement, the First Amended Declaration sets forth various covenants that "touch and concern" the land, including the imposition of various restrictions relating to land use, permissible architecture, and landscaping within the subdivision. *See Waikiki Malia,* 75 Haw. at 384, 862 P.2d at 1057 (concluding that a height restriction "[c]learly" satisfied the touch and concern element because it diminished the value of the land by limiting what could be built on it). Thus, the first element is satisfied.

To determine whether the covenanting parties intended the covenant to run with the land, the language of the deed is examined. *Id.* at 384, 862 P.2d at 1057. The Dorans' warranty deed states that their lot is subject to the First Amended Declaration, which expressly states that the covenants and restrictions set forth therein "shall run with the land and shall be binding on all parties having or acquiring any right, title or interest in the Property or any part thereof." Such language clearly supports the conclusion that the parties intended the covenants to run with the land. *Cf. Lee v. Puamana Cmty. Ass'n,* 109 Hawai'i 561, 568, 128 P.3d 874, 881 (2006) ("[W]e have long held that where a deed makes a specific reference to a restrictive covenant, the grantee is on notice that his interest is subject to the terms of that restrictive covenant." (Citations omitted.)).

Furthermore, the fact that the covenants were created as part of a general plan of development for the Subdivision demonstrates that the covenants were intended to run with the land. As set forth in the Restatement of Property:

If the promise was procured by the promisee in pursuit of a general plan of development which includes not only the land with respect to which the promise was made but other land as well, the likelihood that the promise was expected to be binding upon the successors of the promisor is great, as it would in all probability seriously interfere with the successful carrying out of the plan if this were not true. A general plan implies a controlled stability of use and appearance. This fact is one of the chief inducements to purchase under the plan. Such stability is within the normal expectations of the parties to promises made pursuant to it. It would not exist unless the promises respecting use made by the parties to the conveyances under the plan bound not only the respective promisors but their successors as well. Hence the fact that a promise is made pursuant to a general plan tends strongly to prove that the promise was intended to bind the successors of the promisor.

Restatement of Prop.: Servitudes § 531 cmt. d (1944). Thus, the second element is also clearly met.

▮▮▮▮ According to *Waikiki Malia,* privity of estate is the third element required for a covenant to run with the land. 75 Haw. at 383–84, 862 P.2d at 1057. As stated in that case:

Generally, "privity of estate requires a particular kind of relationship between the original covenantor and the covenantee." *Flying Diamond Oil,* 776 P.2d at 628. There are three types of privity:

(1) mutual, *i.e.,* a covenant arising from simultaneous interests in the same land; (2) horizontal, *i.e.,* a covenant created in connection with a conveyance of an estate from one of the parties to another; and (3) vertical, *i.e.,* the devolution of an estate burdened or benefitted by a covenant from an original covenanting party to a successor.

*Id.*

*Waikiki Malia,* 75 Haw. at 386–87, 862 P.2d at 1058. We did not specify, however, which of the foregoing three types of privity are required to fulfill the privity of estate element. Rather, we focused only on vertical privity, holding that its existence satisfied the requirement. *Id.* at 387, 862 P.2d at 1058. As stated in that case, "[v]ertical privity arises when the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefited or burdened." *Id.* at 387, 862 P.2d at 1058 (internal quotation marks, brackets, and citations omitted). It appears, however, that the vertical privity analysis is not applicable to the instant case. As mentioned above, *Waikiki Malia* is distinguishable from the instant case because the issue in that case was whether privity of estate existed between the covenanting parties such that a specific covenant was enforceable against a specific covenantor. Here, on the other hand, there is no "person presently claiming the benefit, or being subjected to the burden" because we are not determining whether a specific covenant is enforceable against a specific party. Rather, we are faced with the more abstract question of whether the covenants set forth in the First Amended Declaration constitute covenants that run with the land as a matter of statutory interpretation. Thus, a vertical privity of estate analysis is not necessary in the unique situation presented here. We therefore turn to a discussion on the remaining two types of privity: horizontal and mutual.

It appears that horizontal privity was present in this case with respect to the original Declaration insofar as the covenants therein were created in connection with the conveyance of the Property from Pioneer, the original covenantee, to OHC, the original covenantor. *See supra* Section I.A. It further appears that mutual privity is also present in this case with respect to the First Amended Declaration because the covenants therein arose from "simultaneous interests in the same land" inasmuch as OHC was the fee owner of the entire Property at the time the covenants were imposed thereon by recordation of the First Amended Declaration, and Pioneer, by virtue of the original Declaration, had the authority to enforce the covenants. *See supra* Section I.A.[13]

Accordingly, the covenants in the First Amended Declaration run with the land [14]

13. We recognize that some authority suggests that horizontal and mutual privity should no longer be required for a covenant to run with the land. *E.g., Flying Diamond Oil,* 776 P.2d at 628 ("Modern legal writers unanimously favor the abolition of at least mutual and horizontal privity." (Quoting 5 Richard R. Powell, *The Law of Real Property* ¶ 673(2)(c), at 60–67 (1988).)); *Bright v. Lake Linganore Ass'n, Inc.,* 104 Md.App. 394, 656 A.2d 377, 390 (1995) (noting that "modern view" of privity "abolished the requirements of both horizontal and mutual privity, retaining only the requirement of vertical privity"). *But see People for Pres. & Dev. of Five Mile Prairie v. City of Spokane,* 51 Wash.App. 816, 755 P.2d 836, 841 (1988) ("Horizontal privity of estate is one of the requirements for an agreement to run with the land and bind successors in interest." (Citation omitted.)). It appears however, that those cases focusing on vertical privity, like *Waikiki Malia,* discuss whether a covenant runs with the land for purposes of determining its enforceability against a specific party. *See, e.g., Flying Diamond Oil,* 776 P.2d 618 (suit to enforce owner of mineral estate's promise to pay surface owner); *Bright,* 656 A.2d 377 (homeowners' association sued lot owners seeking to enforce covenant against them). The focus on vertical privity arises from the view that "the

parties to an action to enforce a covenant, if not themselves makers of the contract, must each have succeeded by privity to the estate of one of such makers...." *Flying Diamond Oil,* 776 P.2d at 628 n. 13 (quoting *165 Broadway Bldg., Inc. v. City Investing Co.,* 120 F.2d 813, 816 (2nd Cir. 1941)). As discussed above, however, the present case is not an action to enforce a covenant against a specific party, and, thus, the reason for focusing on vertical privity does not exist here.

We express no opinion regarding the view that horizontal and mutual privity should not be required for a covenant to run with the land in the context of enforcing a specific covenant against a specific party. Rather, we only note that horizontal and mutual privity exist here and hold that a vertical privity analysis is not necessary in the unique situation presented by this case because there is no person "presently claiming the benefit, or being subjected to the burden," thereby distinguishing *Waikiki Malia.*

14. The Restatement (Third) of Property supports this conclusion. In a section entitled "Servitudes Implied From General Plan," it provides: "Unless the facts or circumstances indicate a contrary intent, conveyance of land pursuant to a general plan of development implies the creation

such that KHHA is a "planned community association" for purposes of HRS § 607–14. We therefore hold that KHHA is not subject to the twenty-five per cent cap on its attorneys' fees incurred on appeal.[15]

## IV. CONCLUSION

Based on the foregoing, we affirm the ICA's November 3, 2006 final judgment, which affirmed the circuit court's judgment in part and vacated with respect to its award fees and costs, but for the reasons stated herein. Accordingly, the matter is remanded to the circuit court with instructions: (1)(a) to enter an award of fees in favor of KHHA to be taxed against the Dorans in the amount of $2,995.06 and (b) to determine whether and to what extent KHHA is entitled to additional fees based on HRS § 607–14.5; and (2) to recalculate its award of costs pursuant to HRCP Rule 54(d) and HRS § 607–9. We further reverse the ICA's December 29, 2006 fees and costs order with respect to its award of fees.[16]

of servitudes ..." Restatement (Third) of Prop.: Servitudes § 2.14 (2000). The Restatement defines "servitude" as "a legal device that creates a right or an obligation that runs with land or an interest in land." Restatement (Third) of Prop.: Servitudes § 1.1 (2000).

15. We emphasize that our holding that KHHA is entitled to attorneys' fees incurred on appeal pursuant to HRS § 607–14 does not entitle KHHA to request fees pursuant to this statute for the fees it incurred in the circuit court. *See* Section III.B.1, *supra*.

16. A separate order awarding fees and costs incurred on appeal in favor of KHHA to be taxed against the Dorans will be entered forthwith in accordance with this opinion.